Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/20/2024 09:12 AM CST

Emily Sulzle, appellee, v.
Joshua Sulzle, appellant.

___ N.W.3d ___

Filed December 20, 2024.    No. S-23-400.

1. **Modification of Decree: Child Custody: Visitation: Child Support: Appeal and Error.** Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and will be affirmed absent an abuse of discretion.
2. **Motions for New Trial: Judgments: Appeal and Error.** A motion for new trial is addressed to the discretion of the trial court, and the trial court's decision will be upheld unless it is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.
3. **Due Process: Notice.** Due process does not guarantee an individual any particular form of state procedure; instead, the requirements of due process are satisfied if a person has reasonable notice and an opportunity to be heard appropriate to the nature of the proceeding and the character of the rights which might be affected by it.
4. ____: ____. Procedural due process is not violated when there is actual notice.
5. **Attorneys at Law: Notice.** Notice to the counsel of record constitutes notice to the party represented by such counsel.
6. **Records: Proof: Appeal and Error.** In appellate proceedings, unless there is proof to the contrary, the journal entry in a duly authenticated record of the trial court imports absolute verity.
7. **Trial: Records: Evidence: Appeal and Error.** The transcript of the orders or judgment entered is the sole, conclusive, and unimpeachable evidence of the proceedings in the district court, and the correctness of the record may not be assailed collaterally in an appellate court.
8. **Modification of Decree: Visitation.** The right of parenting time is subject to continual review by the court, and a party may seek modification

of a parenting time order on the grounds that there has been a material change in circumstances.

9. **Modification of Decree: Child Custody: Proof.** Proof of a material change of circumstances is the threshold inquiry in a proceeding on a complaint to modify, because issues determined in the prior custody order are deemed preclusive in the absence of proof of new facts and circumstances.

10. **Modification of Decree: Words and Phrases.** A material change in circumstances means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently.

11. **Modification of Decree: Visitation: Proof.** The party seeking to modify visitation has the burden to show a material change in circumstances affecting the best interests of the child.

12. **Modification of Decree: Visitation.** Once the court determines that a material change in circumstances warrants a modification of the parenting plan, a trial court has discretion to set a reasonable parenting time schedule.

13. **Visitation.** The best interests of the children are the primary and paramount considerations in determining and modifying visitation rights.

14. ____. Parenting time relates to continuing and fostering the normal parental relationship of the noncustodial parent.

15. **Parent and Child: Visitation.** A reasonable visitation schedule is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent.

16. **Courts: Child Custody: Visitation.** The authority to determine custody and visitation cannot be delegated, because it is a judicial function.

17. **Juvenile Courts: Parental Rights.** Parental visitation rights, as a subject within the Nebraska Juvenile Code, are matters for judicial determination.

18. **Child Custody: Visitation.** The rule that custody and visitation of minor children are to be determined on the basis of their best interests clearly envisions an independent inquiry by the court.

19. ____: ____. Delegation of the court's duty to determine custody and visitation could result in the denial of proper visitation rights of the noncustodial parent.

20. **Parent and Child: Visitation.** A decree awarding one parent the custody of a child should, under normal circumstances, include a provision permitting the noncustodial parent visitation with the child under such conditions and in such manner as the circumstances may warrant, and only under exceptional circumstances should that right be totally denied.

21. **Visitation: Presumptions.** There is a strong presumption in favor of
    visitation, and the right of access to one's children should not be denied
    unless the court is convinced such visitations are detrimental to the best
    interests of the child.
22. **Child Custody: Words and Phrases.** Under the Parenting Act, joint
    legal custody is the joint authority and responsibility for making major
    decisions regarding the child's welfare, while sole legal custody essen-
    tially establishes that one party will have the final say in such decisions.
23. **Divorce: Judgments: Intent.** The parenting plan incorporated with the
    decree becomes one integrated judgment, the meaning of which must be
    determined from all parts thereof, read in its entirety and, if possible,
    bringing all parts into harmony as far as this can be done by fair and
    reasonable interpretation.

Appeal from the District Court for Lancaster County, Susan
I. Strong, Judge. Affirmed in part, and in part reversed and
remanded with directions.

Matt Catlett, of Law Office of Matt Catlett, for appellant.

Nicholas R. Glasz, of Glasz Law, for appellee.

Funke, C.J., Miller-Lerman, Cassel, Stacy, Papik, and
Freudenberg, JJ.

Freudenberg, J.
## INTRODUCTION
The father appeals the district court's order modifying par-
enting time under a dissolution decree, including ordering all
parenting time with two teenaged daughters to be at the discre-
tion of the mother. The father also appeals the court's denial of
his pro se motion for new trial, alleging lack of notice of the
modification hearing. The father did not appear at the modifi-
cation hearing, but an attorney who worked in the same firm
as the attorney who had filed the father's complaint appeared
at the hearing, cross-examined the mother, and made argu-
ments. The court set forth in its modification order that the
father was not present at the hearing but was represented by
his attorney. In an affidavit submitted in support of his motion

for new trial, the father averred he had been communicating with the attorney who appeared on his behalf at the modification hearing but denied she had notified him of the hearing. There was no written order scheduling the hearing. The attorney stated that the father was given notice of the date of the hearing. We reverse that part of the modification order governing the father's visitation with the daughters and remand the cause with directions, and we affirm the remainder of the district court's order.

## BACKGROUND

In December 2020, the district court entered a "Decree of Dissolution of Marriage" dissolving the marriage of Emily Sulzle and Joshua Sulzle. Four children were born of the marriage, Aurora Sulzle, born in 2005, Olivia Sulzle, born in 2007, Samuel Sulzle, born in 2009, and Elijah Sulzle, born in 2010.

### Custody and Support in 2020 Decree

In the decree, the court "ORDERED, ADJUDGED AND DECREED that [Emily] is a fit and proper person to have the legal and physical care, custody and control of the minor children."

It gave Joshua "reasonable rights of parenting time pursuant to the Court Ordered Parenting Plan" that was attached to the decree and incorporated therein. The court ordered that Joshua pay child support for the children until they marry, die, become of legal age, enter the military service, or are self-supporting, or by further order of the court.

The parenting plan gave Emily primary physical custody of the children. It provided both a routine schedule of visitation and a schedule of visitation for holidays, vacations, and special occasions. The regular visitation schedule was from 7:30 p.m. on Sunday to 9 p.m. on Monday and from 7:30 p.m. on Wednesday to 9 p.m. on Thursday. The parent beginning his or her parenting time was to pick up the children from the other parent's residence.

The parenting plan stated that the parties agreed "they will communicate in a friendly and kind manner . . . and never argue, make disparaging remarks, or discuss parental matters involving conflict in front of or near the presence of the children."

The parenting plan stated that "[t]he parents agree that they will share joint legal custody of the children . . . ." It set forth that this would involve discussing and mutually agreeing upon major decisions.

### Joshua's Motion to Show Cause and Cross-Motions for Modification

In April 2022, Alyson K. Ryan and Jerrad R. Ahrens of Cordell Law, LLP (Cordell Law Firm), filed on Joshua's behalf a verified motion for an order to show cause why Emily should not be found in contempt of court, alleging that Emily had violated the decree in several respects, including by denying Joshua parenting time with the children and by disparaging him to the children. The appellate record does not contain a formal entry of appearance by Ryan and Ahrens as Joshua's counsel. The law firm was listed under their names on the motion, as was the address of the firm and other contact information.

In the motion, Joshua described that the court had awarded joint legal custody, and he also generally alleged that Emily was violating the decree by failing to discuss and mutually agree upon major decisions. The district court ordered Emily to appear for a hearing on the motion.

Two days after the court issued its order to show cause, Joshua filed a complaint for modification, alleging a substantial and material change in circumstances had occurred related to his earnings that would decrease his child support obligations. The complaint similarly listed Ryan and Ahrens as Joshua's attorneys at the Cordell Law Firm and listed their address and contact information.

Emily denied the allegations in Joshua's motion for an order to show cause and requested an order dismissing the

motion. She filed an answer and counterclaim responding to Joshua's complaint for modification and alleging a material change in circumstances warranted modification of the parties' custody arrangement, child support, and childcare expenses. These included that the current parenting plan was not in the children's best interests and that Joshua was capable of providing support for the children, including child support, health insurance, medical expenses, daycare, and extracurricular expenses. She asked for a new parenting plan, including a new parenting time schedule.

### SUBSTITUTIONS OF COUNSEL AND CONTINUANCES

Beginning in May 2022, there were some substitutions of Joshua's counsel within the Cordell Law Firm. Also, several continuances of the hearing on the complaint for modification and the order to show cause were granted.

On May 12, 2022, Ryan filed a substitution of counsel motion with the district court. Ryan withdrew as Joshua's attorney "for the reason that the case ha[d] been transferred to Megan E. McDowell," another attorney at the Cordell Law Firm. In the motion, Megan E. McDowell entered her appearance as counsel. Ahrens was not mentioned in the motion.

On May 23, 2022, Emily moved to continue the hearing that was scheduled for June 14. Following a videoconference (Zoom) hearing, in an order dated May 27, 2022, the district court granted Emily's motion and scheduled trial for August 3. The court described that McDowell had appeared for Joshua at the hearing.

On July 21, 2022, McDowell filed a substitution of counsel motion with the district court. McDowell withdrew as Joshua's counsel "for the reason that the case ha[d] been transferred to Christopher Johnson, with [Cordell Law Firm]." In the filing, Christopher M. Johnson also entered his appearance. Ahrens was not mentioned.

On July 28, 2022, Ahrens filed a motion to continue the hearing because discovery was ongoing, and Joshua had recently

obtained new counsel. The motion set forth that it was brought by "[Joshua], by and through his attorney, Jerrad R. Ahrens."

On July 29, 2022, the court granted Joshua's motion to continue trial. The matter was set for hearing on October 20.

On October 19, 2022, Emily filed a motion to compel discovery responses with the district court. Emily described that Joshua had yet to respond to Emily's first set of interrogatories and first set of requests for production of documents, which were sent on July 5. The motion set forth a notice of hearing to be held on October 20.

The certificate of service electronically signed by Emily's attorney stated a copy of the motion had been served via email "upon [Joshua's] counsel, Meghan E. Wolf."

The appellate record does not specify when Meghan E. Wolf began representing Joshua. The appellate record does not reflect a filing of substitution of counsel or entry of appearance by Wolf.

## Joshua's Failure to Appear

The hearing on contempt and modification of the decree occurred on January 31, 2023. According to Joshua's brief on appeal and the clerk of the district court's responses to Joshua's requests for a supplemental transcript, no document, other than Emily's motion to compel discovery responses, was filed between July 30, 2022, and February 20, 2023.

Joshua did not appear at the January 31, 2023, hearing in person or via Zoom. Wolf, however, appeared on his behalf via Zoom. Wolf described to the court her "minimal communication" with Joshua and her not knowing "what is going on with that," explaining only, "I do know that he was searching for employment the last time I had spoken to him."

## Motion for Continuance

Wolf asked to continue the hearing an additional 14 days to respond to the discovery that was the subject of Emily's motion to compel and to discuss with Joshua an offer made

by Emily's counsel. Wolf stated, "And if I do not hear from my client within the next 10 to 14 days or get the things that [opposing counsel] needs, I will certainly be filing a motion to withdraw, as well, but I am just asking for an additional 14 days."

Emily's attorney objected to further delay, noting the contempt and modification of the decree had been pending since May, he had "issued discovery a long time ago," and there had been multiple continuances and other attorneys involved, with no fault of Emily for the delay. Emily's attorney summarized:

I'm not trying to be . . . unreasonable here, but my client has paid me . . . a significant amount of money to prepare for a contempt, prepare for trial, to do discovery, to show up today, to prosecute the case, to litigate the case, and I think this is the second time opposing party has not shown up.

So . . . I truly believe that it would be inappropriate to continue the matter.

The district court overruled the motion for continuance and vacated its order to show cause. The district court proceeded to hold a modification hearing on Emily's counterclaim.

### Evidence at Modification Hearing

Emily testified that the current parenting plan is not in the best interests of Aurora and Olivia. With respect to holidays, vacations, and special occasions, Emily explained that "with very short notice," Joshua does not "show up on some holidays." She said that Joshua presents this failure to exercise his parenting time "as a gift" to Emily, but Emily was "generally under the assumption that he is blowing [the children] off."

Emily explained that Joshua is currently behind on his child support obligations by $3,500. She testified, "[H]e will be $730 more behind tomorrow." It was her understanding that Joshua had full-time employment.

With respect to the regular visitation schedule, Emily testified that "[t]he boys go over for their parenting time," but the girls "refuse to go over." She testified that she imposes

consequences on the girls for violating her direction to participate in their visitation time with Joshua. She testified that Joshua communicates with the girls by phone and text messaging but that often "he'll go on a tirade about [Emily], and so they'll cut him off and place a boundary there."

Emily testified without objection that Aurora's therapist would opine that it was not in Aurora's best interests to be forced to participate in parenting time with Joshua. Emily testified that she "would hope that [Joshua] would invite [the girls] to see him, work on their relationship . . . but [she does] not believe forcing them is wise." Emily explained she had provided Joshua the information for the therapist "multiple times." She testified she is not opposed to Joshua's seeing his daughters, but, rather, that it is not in their best interests to be forced to visit him when Joshua has failed to take steps to build a relationship with them.

Emily believed that reasonable visitation with Aurora and Olivia at her discretion would be appropriate. She stated she would comply with any reasonable request for parenting time with the girls and would be able to communicate with Joshua to effectuate reasonable parenting time. She explained that she and Joshua currently use the "Talking Parents app" for their communication. However, Emily testified Joshua "frequently uses it to send insulting and harassing messages to [her], as opposed to communicate about the kids." Further, Joshua had expressed to Emily that "he does not want to use the app because [she] can manipulate it."

Emily pointed out an inconsistency between the original 2020 decree and its attached parenting plan regarding legal custody. She noted the decree specified she retained both sole legal and physical custody of the children, but under its attached parenting plan, she retained only sole physical custody of the children, and the parties shared legal custody. Emily opined that awarding her sole legal and physical custody would correct this inconsistency and serve the children's best interests.

## Arguments By Wolf

Following the presentation of evidence, Wolf first noted that although she had informed Joshua of the date of the hearing, she did not have "acknowledgment" from him. She said: "For purposes of the record, I would like to state that I do not have confirmation from my client. I have not spoken to him since providing him this date; therefore, I'm unsure of his acknowledgment of today's date." She then argued that Joshua "had concerns about his time being alienated and that information coming from [Emily] is certainly concerning that she wishes to hold off on visitation between the girls and their dad, without any actual, physical evidence from a professional or a third party."

## Order of Modification and Dismissal of Joshua's Complaint

The court pronounced from the bench, "Well, considering that [Joshua] has failed to appear today and was ordered to appear, the Court does grant [Emily's] counterclaim for a modified parenting plan . . . the Court finds that there has been a material change in circumstances in the relationship between the two minor girls and their father . . . ."

In a written order for modification dated February 21, 2023, the court set forth that at the modification hearing, "[Joshua] was not present but was represented by his attorney, Meghan Wolf." The court formally overruled Joshua's motion for an order to show cause and vacated its order to show cause. The court dismissed Joshua's complaint for modification.

The court then found there had been a material change in circumstances since the decree was issued that warranted modification.

The order stated Emily shall have sole legal and physical custody of all four children, subject to Joshua's parenting time and specified in a new parenting plan attached and incorporated into the order for modification, which the court found to be in the best interests of the minor children.

The court set forth that any provisions of the 2020 decree not specifically modified shall remain in effect as ordered.

The court's modification order provided that the best interests of the four minor children "will be maintained through the ongoing involvement of both [Emily] and [Joshua]." The court found that "[e]ach parent is a fit and proper person to be involved in the parenting of the minor children."

Each parent was ordered to provide the other with "information related to educational achievements and deficiencies of the children" and "provide each other reasonable advance notice of any events, occurrences or decisions relevant to the children's education." The order stated that all communications between the parents shall be through a coparenting application and conducted "in a business-like manner without language that is sarcastic, derogatory, inflammatory, threatening, demeaning, judgmental, accusatory, or relates to past problems or failures to communicate."

Several more particulars of said communication were set forth in the new parenting plan. The parenting plan also described that it was "not a violation of the terms of this plan if [Emily] allows [Joshua] parenting time in addition to" that set forth.

The new parenting plan specified that "[a]ny and all of [Joshua's] parenting time, both regular and holidays," with Aurora and Olivia "shall be at [Emily's] sole discretion with at least seven (7) days prior notice from [Joshua]." If Emily agreed on a specific parenting time, Joshua was to pick up Aurora and Olivia from Emily at the beginning of the parenting time and return them to Emily at the end of the parenting time.

The modified parenting plan provided that Joshua shall have regular parenting time with Samuel and Elijah "every week beginning [at] 7:30 p.m. on Sunday and concluding at 7:30 p.m. on Monday and beginning at 7:30 p.m. on Wednesday and concluding at 7:30 p.m. on Thursday." This changed only the concluding time, which was 9 p.m. under the prior parenting plan. Because many of the holidays, vacations,

and special occasions followed the regular parenting time schedule, these also concluded at 7:30 p.m., rather than 9 p.m., as originally ordered in the 2020 parenting plan. The court ordered that Joshua was responsible for picking up the minor children from Emily at the beginning of his parenting time and returning them to her at the conclusion of his parenting time, which was a change from the 2020 parenting plan, when the parent beginning parenting time was responsible for pickup. The new parenting plan added provisions about being on time for visitation and scheduling activities during the other parent's parenting time.

## Motion For New Trial

On March 1, 2023, Joshua, proceeding pro se, filed a motion for new trial. He cited as statutory grounds Neb. Rev. Stat. § 25-1142(1) (Reissue 2016) (irregularity or abuse of discretion), (3) (accident or surprise), and (6) (insufficiency of evidence or contrary to law). He asserted in the motion that he was "not informed by Christopher Johnson, Jerrod [sic] Ahrens (my attorneys on record) Meghan Wolf or anyone else at the Cordell [L]aw [F]irm that there was a trial set for January 31, 2023." He also asserted, "There was no written order entered by the court setting the matter for trial on January 31ˢᵗ, 2023." Joshua attached to his motion an affidavit averring he "never received any notice of any kind that there would be a trial or other hearing on January 31, 2023," and describing communications with the Cordell Law Firm, including with Wolf, who allegedly informed him that the October 20, 2022, hearing date would need to be moved but did not ever tell him the new date of the hearing.

The hearing on the motion for new trial was held on March 28, 2023. Joshua personally offered the affidavit into evidence, and it was received.

Wolf appeared as Joshua's counsel at the hearing but explained she had a pending motion to withdraw. She said she had "no position, essentially, on the motion that was filed. . . . That was filed by [Joshua] on his own."

Motions to withdraw were filed on March 13 and 15, 2023, for the stated reason that Joshua had failed to fulfill the terms of the fee agreement. "MEGHAN WOLF, and CORDELL LAW, LLP, ("Counsel")," made the requests. Ahrens was also listed under the signature lines in the motions.

## Affidavit

According to the affidavit, Joshua initially retained Ryan of the Cordell Law Firm to pursue a contempt claim against Emily. On May 4, 2022, Joshua received an email from Ahrens, the "'Management Partner'" of the Cordell Law Firm, notifying him that Ryan was "'transitioning'" out of the firm and that McDowell would be "'stepping in'" as lead attorney in the case.

On July 8, 2022, Joshua received another email from Ahrens stating McDowell was also transitioning out of the firm and that Johnson would be stepping in as lead attorney until August 1, after which Joseph Neuhaus would take over as lead attorney.

Joshua sent an email on August 2, 2022, to a paralegal at the Cordell Law Firm requesting to schedule an appointment "with 'whoever' [his] lawyer was." The paralegal advised him to contact Wolf.

Joshua met with Wolf via Zoom on August 17, 2022. He stated in his affidavit that "[e]ven after [his] Zoom meeting with Ms. Wolf, [he] was still confused as to who [his] actual lawyer was. Was it Christopher Johnson? Joseph Neuhaus? Jerrad Ahrens? Meghan Wolf?"

Around this time, Joshua was informed through the paralegal that trial had been rescheduled from August 2, 2022, to October 20. On October 17, Joshua contacted Wolf via email regarding his upcoming trial and explained that he had not heard from her since their meeting. Wolf told Joshua that the hearing was still scheduled for October 20 and that she was trying to communicate with opposing counsel about some remaining issues.

The next morning, Wolf contacted Joshua regarding outstanding discovery. At that time, she indicated that the trial scheduled for October 20, 2022, would need to be moved to allow sufficient time to respond.

Joshua averred that, after further communications with Wolf regarding discovery, he received an email from Wolf on January 30, 2023, the day before trial. The email stated, "'I have spoken with opposing counsel, and she is willing to lower the child support amount, and discuss a few weeks with the girls for the summer. They are requesting updated paystubs from you to determine an appropriate amount of support.'" According to the affidavit, "[n]owhere in that email did Ms. Wolf mention a trial the following day."

Joshua averred that on February 1, 2023, he received a followup email from Wolf that read: "'The judge entered an order regarding the contempt and modification over my objection yesterday. Your time with the girls has been modified. The girls are in therapy and you will be receiving time with them at her discretion. I do not have the order yet to send you.'" According to Joshua, he "had no idea what she was talking about."

### Statements at Hearing on Motion for New Trial Regarding Notice

Emily's attorney argued at the hearing on the motion for new trial that Joshua was on notice of the trial and that Joshua had a history of not appearing in court. Emily's attorney claimed Joshua was communicating with his attorneys and that his attorney was present at trial.

Wolf stated that notice of the January 31, 2023, hearing was in fact provided to Joshua. She explained:

> Your Honor, it's our position that not only was notice provided, but also there was a domestic term email from the Court's bailiff that kind of had the cases on there, and some were crossed out due to, you know, settling or whatever, and it is our position that that was sent to the client, as well, that email we received from the Court.

The court pronounced from the bench that it was overruling the motion for new trial and allowing Wolf to withdraw from the case. A subsequent written order was signed and file stamped on April 27, 2023. The order provided: "This matter comes on for consideration on [Joshua's] request (by telephone) for a written order memorializing this Court's ruling on [Joshua's] Motion for New Trial. The Motion was heard and overruled on March 28, 2023 on the record in open court. No further Order is required."

## ASSIGNMENTS OF ERROR

Joshua first assigns that the district court erred by denying his motion for new trial

> because (a) there was no written, filed order directing that the trial occur at the time the trial was actually held, and because Joshua did not personally appear at the trial, (b) neither of Joshua's attorneys of record appeared at the trial, (c) the attorney who ostensibly represented Joshua at the trial had not filed an appearance as his attorney as of the trial, did not even *personally* appear at the trial, and did not file an appearance as Joshua's attorney by the close of the next business day after the trial, as required by court rule, and (d) Joshua swore in an affidavit that he had no notice of the trial.

Joshua further assigns as error: "In the event that the district court's denial of Joshua's motion for new trial is reversed, the district court judge should be ordered disqualified on remand due to the appearance of bias against Joshua."

In the event he is not entitled to a new trial, Joshua assigns the district court erred in modifying the decree "because there was no evidence of a material change in circumstances affecting the best interests of the children, and because there was insufficient evidence that the actual modifications adopted were in the children's best interests."

Lastly, Joshua assigns as error that "[t]he district court erred in delegating its authority to determine Joshua's parenting time with Aurora and Olivia to Emily."

## STANDARD OF REVIEW

[1] Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and will be affirmed absent an abuse of discretion.[1]

[2] A motion for new trial is addressed to the discretion of the trial court, and the trial court's decision will be upheld unless it is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

## ANALYSIS

### APPEARANCE AND NOTICE

Joshua argues that his motion for new trial should have been granted because there was no written court order scheduling the modification hearing; he did not receive actual notice of the hearing; Wolf was not his attorney "of record"[2] because there was no written entry of appearance, as described in Neb. Ct. R. § 2-204(D) (rev. 2022); and Wolf appeared at the hearing via Zoom. Joshua does not challenge the denial of Wolf's oral motion to continue the modification hearing on the grounds that Joshua did not appear. The district court did not abuse its discretion in denying Joshua's motion for new trial.

Joshua's motion was brought under § 25-1142(1), (3), and (6), which provide for a new trial when the aggrieved party's substantial rights are materially affected by irregularity in the proceedings, a court order or abuse of discretion preventing a fair trial, accident or surprise that ordinary prudence could not have guarded against, or a verdict unsupported by the evidence or contrary to law.

In asserting the facts that he highlights on appeal warranted a new trial, Joshua relies on § 2-204(D) and a proposition

---

[1] *Windham v. Kroll*, 307 Neb. 947, 951 N.W.2d 744 (2020).

[2] Brief for appellant at 21.

from Pennsylvania that courts should record all their orders, rules, and decrees.

Section 2-104(D) provides:

> Appearance. Attorneys shall make an entry of appearance by filing a notice of appearance. If an attorney initially appears at a proceeding in open court and orally enters an appearance, he or she shall file an entry of appearance by the close of the next business day. An oral entry of appearance captured by the courtroom clerk which generates a journal entry showing such entry of appearance satisfies this requirement.

Section 2-104(D) does not specify the consequences of the lack of a written entry of appearance. Nor does it state that, without such written of entry of appearance, an attorney is not the attorney of record. Indeed, in *Roemer v. Maly*,[3] we said that an attorney was the attorney of record by virtue of signing the initial pleading.

The Pennsylvania proposition Joshua relies upon concerns the need for written orders and states: "Decrees and orders of courts of record cannot be carried in the breast of the judge who makes them. If any regard is to be had to the regular and orderly conduct of judicial proceedings in such courts, all their orders, rules, and decrees must be recorded."[4] The cases in which this proposition has been cited concern contempt for disobeying an order of the court.[5] This proposition does not address under what circumstances an order following a hearing should be set aside when the aggrieved party did not appear but was represented by counsel.

---

[3] *Roemer v. Maly*, 248 Neb. 741, 539 N.W.2d 40 (1995).

[4] *In re Tumpson*, 236 Pa. Super. 568, 571, 345 A.2d 774, 776 (1975), quoting *Commonwealth ex rel. Magaziner v. Magaziner*, 434 Pa. 1, 253 A.2d 263 (1969), quoting *In re Garis*, 185 Pa. 497, 39 A. 1110 (1898) (internal quotation marks omitted) (emphasis omitted). See, also, e.g., *In Interest of Vaglica*, 344 Pa. Super. 31, 495 A.2d 974 (1985).

[5] See *id*.

[3,4] It is somewhat difficult to discern Joshua's argument, untethered as it is to any law that would lead us to the conclusion that the district court erred in denying his motion for new trial. But we agree with Emily that procedural due process is the substantial right that Joshua, in essence, argues was materially affected by his alleged lack of notice and representation. Due process does not guarantee an individual any particular form of state procedure; instead, the requirements of due process are satisfied if a person has reasonable notice and an opportunity to be heard appropriate to the nature of the proceeding and the character of the rights which might be affected by it.[6] An "elementary and fundamental" requirement of procedural due process is notice reasonably calculated, under all the circumstances, to inform interested parties of action affecting their rights.[7] While actual notice is not the test of compliance with procedural due process,[8] procedural due process is not violated when there is actual notice, because actual notice serves the same purposes legal notice is intended to accomplish.[9]

[5] We have held that notice to the counsel of record constitutes notice to the party represented by such counsel.[10] Accordingly, in *Roemer*, we affirmed an order of dismissal following a hearing on an order to show cause, even though neither the plaintiff, nor the plaintiff's counsel, appeared at the hearing.[11] We held that the court did not err in denying the plaintiff's motion to vacate the order to show cause because

---

[6] *Blank v. Blank*, 303 Neb. 602, 930 N.W.2d 523 (2019).

[7] See *Mullane v. Central Hanover Tr. Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 94 L. Ed. 865 (1950).

[8] See, e.g., *Slaven v. Engstrom*, 710 F.3d 772 (8th Cir. 2013); *Griffin v. Bierman*, 403 Md. 186, 941 A.2d 475 (2008).

[9] See, *Hroch v. City of Omaha*, 4 F.3d 693 (8th Cir. 1993); *Pessolano v. Zoning Bd. of Adjustment*, 159 Pa. Commw. 313, 632 A.2d 1090 (1993).

[10] *Roemer v. Maly, supra* note 3. See, also, *Emry v. American Honda Motor Co.*, 214 Neb. 435, 334 N.W.2d 786 (1983).

[11] *Roemer v. Maly, supra* note 3.

the clerk of the court had sent the notice of the hearing to the attorney who had signed the initial pleading using the address listed on the docket sheet. A different attorney at the same partnership signed other documents that were filed with the court, but the partnership dissolved before the hearing, and neither attorney sent the court notification of which attorney was representing the plaintiff or of a change of address. We observed that standard local court practice instructed the clerk to mail notice to attorneys of record and that, by virtue of signing the initial pleading, the attorney who did so was the plaintiff's sole attorney "of record," and neither attorney "advised the court to the contrary."[12] We rejected the plaintiff's argument that a mistake, neglect, omission of the clerk, or irregularity in obtaining the judgment had occurred. We said it was the responsibility of the litigant and not the court or opposing counsel to follow the progress of the case.

[6,7] We do not read *Roemer* as suggesting there is only one manner by which an attorney may be "of record," especially when considering an actual appearance by counsel at the hearing at issue. In this case, the district court, in its written order following the modification hearing, set forth that Joshua was "represented by his attorney, Meghan Wolf." In appellate proceedings, unless there is proof to the contrary, the journal entry in a duly authenticated record of the trial court imports absolute verity.[13] In the context of court orders describing what has transpired below, we have said, "The transcript imports absolute verity, and cannot be impeached. If incorrect, or if it fails to speak the truth, the correction must be made in the district court and not here."[14] Stated another way, the transcript

---

[12] *Id.* at 743, 539 N.W.2d at 43.

[13] *Ginger Cove Common Area Co. v. Wiekhorst*, 296 Neb. 416, 893 N.W.2d 467 (2017).

[14] *Lippincott v. Lippincott*, 144 Neb. 486, 488, 13 N.W.2d 721, 723 (1944) (internal quotation marks omitted). See, also, e.g., *Alder v. First Nat. Bank & Trust Co.*, 241 Neb. 873, 491 N.W.2d 686 (1992); *Zabloudil v. Lane*, 159 Neb. 547, 68 N.W.2d 193 (1955).

of the orders or judgment entered is the sole, conclusive, and unimpeachable evidence of the proceedings in the district court, and the correctness of the record may not be assailed collaterally in an appellate court.[15] Nothing in the appellate record contradicts the district court's statement, in the record, that Joshua was represented by his attorney at the modification hearing. This is sufficient to satisfy procedural due process requirements of reasonable notice and an opportunity to be heard appropriate to the nature of the proceeding and the character of the rights affected by it.

Furthermore, the record reflects that Ahrens signed the initial pleadings on Joshua's behalf, and Joshua admits Ahrens was a counsel of record. In the context of notice to a litigant, we have said that "[w]hen one member of a law firm is retained or employed, such employment or retainer is that of the entire firm . . . ."[16] Thus, in *Ganzer v. Schiffbauer*,[17] we held that the district court did not err in overruling the defendant's motion for new trial alleging he did not have notice of the hearing where neither he appeared, nor any attorney appeared on his behalf. The attorney the defendant had hired was otherwise engaged and did not inform other members of the firm about the case. We said that while the defendant might have a cause of action against the law firm, the neglect of his counsel did not justify a new trial.[18]

Wolf had actual notice of the hearing, which is evident by her appearance via Zoom. Notice to Wolf was notice to Joshua for purposes of procedural due process. The fact that Wolf appeared via Zoom, rather than in person, is of no consequence to a procedural due process analysis. We find no merit to this assignment of error.

---

[15] See *Anzalone Inv. Co. v. City of Omaha*, 179 Neb. 314, 137 N.W.2d 857 (1965).

[16] *Ganzer v. Schiffbauer*, 40 Neb. 633, 638, 59 N.W. 98, 100 (1894).

[17] *Id*.

[18] See *id*.

## Material Change of Circumstances

Turning to the merits of the modification order, Joshua argues as a threshold matter that the court erred in finding a material change of circumstances. We disagree.

[8,9] The right of parenting time is subject to continual review by the court, and a party may seek modification of a parenting time order on the grounds that there has been a material change in circumstances.[19] Proof of a material change of circumstances is the threshold inquiry in a proceeding on a complaint to modify, because issues determined in the prior custody order are deemed preclusive in the absence of proof of new facts and circumstances.[20]

Joshua points out there was no evidence of exactly when Joshua's relationship with Aurora and Olivia deteriorated. Joshua does not explain how the remaining evidence, consisting of Emily's undisputed testimony that Joshua failed to always exercise his visitation rights, sent Emily "insulting and harassing messages," disparaged her to Aurora and Olivia, and was behind on his child support, was insufficient.

[10,11] A material change in circumstances means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently.[21] The party seeking to modify visitation has the burden to show a material change in circumstances affecting the best interests of the child.[22]

Poor communication between the parents can constitute a material change of circumstances warranting a change in custody or visitation.[23] Furthermore, disparagement of the other

---

[19] *Weaver v. Weaver*, 308 Neb. 373, 954 N.W.2d 619 (2021).

[20] *Id*.

[21] *Tilson v. Tilson*, 307 Neb. 275, 948 N.W.2d 768 (2020).

[22] *Id*.

[23] See *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 873 N.W.2d 208 (2016).

parent to the children can be a material change of circum-
stances. In *Hossack v. Hossack*,[24] we said:

> [C]onduct toward a child which tends to poison the
> child's mind against, and alienate his affection from, his
> mother or father, is so inimical to the child's welfare as
> to be grounds for a denial of custody to, or a change of
> custody from, the party guilty of such conduct.

Also, deterioration of the parent child relationship and the
child's preferences can be a material change of circumstances
affecting the child's best interests with respect to child cus-
tody. In *Miles v. Miles*,[25] for instance, we held that a material
change of circumstances supported a change of custody because
a 15-year-old child had a poor emotional relationship with
his mother. Additionally, the mother struggled to discipline
the child, who had violent outbursts and threatened self-harm
in connection with constant expressions of his desire to live
with his father. Two mental health experts supported a change
in custody.

In a less dramatic example, *Floerchinger v. Floerchinger*,[26]
the Nebraska Court of Appeals held that a 15-year-old child's
preference to live with his father was a material change of
circumstances supporting a change in custody. The child had
expressed he was more comfortable living with his father, due
to the relaxed environment at his father's house and because
he enjoyed his interactions with his father. This was in con-
trast to living with his mother in another state in a trailer
with the mother's husband and two young children from her
second marriage. The Court of Appeals noted that the child's
preference "was not a hasty decision, but, rather, was thought-
fully developed over a period of a couple years."[27] Also, the
child had been living with his father during the pendency of

---

[24] *Hossack v. Hossack*, 176 Neb. 368, 374, 126 N.W.2d 166, 170 (1964).

[25] *Miles v. Miles*, 231 Neb. 782, 438 N.W.2d 139 (1989).

[26] *Floerchinger v. Floerchinger*, 24 Neb. App. 120, 883 N.W.2d 419 (2016).

[27] *Id*. at 142, 883 N.W.2d at 435.

the modification hearing and was "thriving both socially and academically in Nebraska, although he may have enjoyed similar benefits [with his mother]."[28]

The implication with respect to the deterioration of Joshua's relationship with Aurora and Olivia and his disparagement of Emily to them was that these occurred after the 2020 decree was issued. Joshua presented no evidence to the contrary. Also, Joshua's failure to exercise holiday visitation or timely pay child support and his harassing messages to Emily occurred after the decree was issued. The district court did not abuse its discretion in finding material changes in circumstances.

## Unlawful Delegation and Best Interests of Aurora and Olivia

Joshua argues that even if there was a material change of circumstances, giving Emily sole discretion to allow him to exercise any parenting time with Aurora and Olivia was not in Aurora and Olivia's best interests and was an unlawful delegation to Emily of the court's sole responsibility to determine visitation. We agree.

[12-15] Once the court determines that a material change in circumstances warrants a modification of the parenting plan, a trial court has discretion to set a reasonable parenting time schedule.[29] The best interests of the children are the primary and paramount considerations in determining and modifying visitation rights.[30] Parenting time relates to continuing and fostering the normal parental relationship of the noncustodial parent.[31] Generally, a reasonable visitation schedule is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent.[32]

---

[28] *Id.*

[29] See *Wolter v. Fortuna*, 27 Neb. App. 166, 928 N.W.2d 416 (2019).

[30] *Id.*

[31] *Id.*

[32] *State on behalf of Pathammavong v. Pathammavong*, 268 Neb. 1, 679 N.W.2d 749 (2004).

[16-19] The authority to determine custody and visitation cannot be delegated, because it is a judicial function.[33] Parental visitation rights, as a subject within the Nebraska Juvenile Code, are matters for judicial determination.[34] The rule that custody and visitation of minor children are to be determined on the basis of their best interests clearly envisions an independent inquiry by the court.[35] Delegation of the court's duty to determine custody and visitation could result in the denial of proper visitation rights of the noncustodial parent.[36]

In *Barth v. Barth*,[37] the Court of Appeals accordingly held that the district court abused its discretion by including in the parenting plan a restriction providing that if the father was not living with an unrelated member of the opposite sex, but the mother was, then the father could refuse to allow her overnight visitation with the minor child, and vice versa. The Court of Appeals reasoned that the provision was an unlawful delegation of the trial court's duty to determine questions of custody and visitation of minor children according to their best interests.[38]

Subsequently, in *Schmeidler v. Schmeidler*,[39] the Court of Appeals held it was an unlawful delegation of the district court's judicial functions to provide in the parenting plan that whenever the mother learned the father had been drinking alcohol during his parenting time, the father's parenting

---

[33] *State on behalf of Ryley G. v. Ryan G.*, 306 Neb. 63, 943 N.W.2d 709 (2020).

[34] *In re Interest of Teela H.*, 3 Neb. App. 604, 529 N.W.2d 134 (1995).

[35] See *id*.

[36] *Deacon v. Deacon*, 207 Neb. 193, 297 N.W.2d 757 (1980), *disapproved on other grounds, Gibilisco v. Gibilisco*, 263 Neb. 27, 637 N.W.2d 898 (2002).

[37] *Barth v. Barth*, 22 Neb. App. 241, 851 N.W.2d 104 (2014).

[38] See *id*.

[39] *Schmeidler v. Schmeidler*, 25 Neb. App. 802, 912 N.W.2d 278 (2018), *disapproved on other grounds, State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019).

time would cease, and the mother could pick the child up. The Court of Appeals noted that because there was no requirement that such information be confirmed, the provision essentially permitted the mother to "unilaterally terminate [the father's] parenting time based on an unconfirmed belief that he ha[d] been drinking."[40] The court found this "has the potential to become problematic, particularly given the parties' history of conflict, and could result in the denial of proper visitation rights of the noncustodial parent."[41]

In a similar vein, in *State on behalf of Ryley G. v. Ryan G.*,[42] we held that blanket permission for the custodial parent to remove the child to one of two possible states, in accordance with future military employment opportunities, was an unlawful delegation of the judicial function to determine custody and visitation. The district court had given permission for the mother to move with the child to a specific state but then also granted blanket permission to later move the child to one of two specific states, at the mother's discretion. We noted that no evidence was presented at the modification hearing, nor were findings made in the best interests framework, in relation to those two states.

More recently, in *VanSkiver v. VanSkiver*,[43] we confirmed the concept of impermissible delegation of judicial authority but ultimately affirmed as modified the custody order because it, in substance, suspended visitation rather than delegating judicial authority. And the suspension of visitation with the children was justified.

The district court's order in *VanSkiver* stated that the children could decline visitation with the father that was set forth in the parenting plan and that no overnight visitations would take place until the father engaged in individual mental health

[40] *Id.* at 813, 912 N.W.2d at 288-89.

[41] *Id.* at 813-14, 912 N.W.2d at 289.

[42] *State on behalf of Ryley G. v. Ryan G., supra* note 33.

[43] *VanSkiver v. VanSkiver*, 303 Neb. 664, 930 N.W.2d 569 (2019).

counseling and then counseling with the children, after which he could petition the court for additional parenting time. In support of the order, the district court found that the children were at risk for mental abuse during visitation and expressed its intent that the order would allow the children to see their father at their discretion.

We explained that the order did not retain any enforceable parenting time with the father; therefore, it was not an unlawful delegation to the children of the court's duty of establishing a parenting schedule. We elaborated, "[T]he children were not given discretion to set the parenting time schedule, nor were they given authority to determine whether or when [the father] could exercise parenting time."[44] The order simply recognized that "the practical reality that the boys may at times still wish to spend time with their father."[45] Still, we modified the order to suspend all of the father's scheduled parenting time, explaining that is what the lower court intended.

The present order sets forth a specific parenting time schedule and then delegates to Emily the sole authority to determine if Joshua could exercise his parenting time so described. The court delegated to Emily the "sole discretion" to permit Joshua to exercise "[a]ny and all . . . parenting time" with Aurora and Olivia, as described by the order. On its face, the order allows Emily to unilaterally terminate Joshua's parenting time with Aurora and Olivia as she sees fit. Granting such blanket authority to Emily was an unlawful delegation of the district court's judicial function to determine custody and visitation.

[20,21] Even if, like in *VanSkiver*, we construe the district court's order as a total suspension of parenting time, the facts of this case are meaningfully different from those presented in *VanSkiver* as to the risks to the minor children during the noncustodial parent's visitation. We have long held that a decree awarding one parent the custody of a child should, under normal circumstances, include a provision permitting

---

[44] *Id.* at 673, 930 N.W.2d at 575-76.

[45] *Id.* at 673, 930 N.W.2d at 575.

the noncustodial parent visitation with the child under such conditions and in such manner as the circumstances may warrant, and only under exceptional circumstances should that right be totally denied.[46] There is a strong presumption in favor of visitation,[47] and the right of access to one's children should not be denied unless the court is convinced such visitations are detrimental to the best interests of the child.[48]

Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) provides that in determining parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the relationship of the minor child to each parent; the desires and wishes of the minor child if of an age of comprehension and when based on sound reasoning; the general health, welfare, and social behavior of the minor child; credible evidence of abuse inflicted on any family or household member; and credible evidence of child abuse or neglect or domestic partner abuse.

Neb. Rev. Stat. § 43-2922 (Cum. Supp. 2022) defines emotional abuse as

> a pattern of acts, threats of acts, or coercive tactics, including, but not limited to, threatening or intimidating to gain compliance, destruction of the victim's personal property or threats to do so, violence to an animal or object in the presence of the victim as a way to instill fear, yelling, screaming, name-calling, shaming, mocking, or criticizing the victim, possessiveness, or isolation from friends and family. Emotional abuse can be verbal or nonverbal.

Neb. Rev. Stat. § 43-2932 (Reissue 2016) requires that limitations, which may include limitations on parenting time, be imposed to protect a child from harm if the preponderance of the evidence demonstrates a parent has committed child abuse or neglect.

---

[46] See *Syas v. Syas*, 150 Neb. 533, 34 N.W.2d 884 (1948).

[47] See *Smith v. Smith*, 222 Neb. 752, 386 N.W.2d 873 (1986).

[48] *Koch v. Koch*, 219 Neb. 195, 361 N.W.2d 548 (1985).

Here, the evidence consisted solely of Emily's testimony. Emily opined that forcing Aurora and Olivia to participate in parenting time was not in their best interests. To support this opinion, she described their refusal to go to visitation, that Joshua would sometimes "go on a tirade about [her]" to the girls, that Joshua does not show up for his visitation on some holidays, and that he had not taken steps to build his relationship with Aurora and Olivia. Emily also testified, without objection, that Aurora was seeing a therapist who would opine that forced visitation was not in Aurora's best interests.

This evidence does not establish emotional or physical abuse or neglect. Neither is it sufficient to rebut the strong presumption in favor of noncustodial parent visitation, under such conditions and in such manner as the circumstances may warrant. Emily did not prove exceptional circumstances showing that any visitation with Joshua is detrimental to Aurora and Olivia.

We hold with respect to Joshua's parenting time with Aurora and Olivia that the modification order unlawfully delegated to Emily a judicial function and that there was insufficient evidence to rebut the presumption in favor of preserving and fostering Joshua's relationship with Aurora and Olivia through adequate parenting time, so as to support depriving Joshua of any visitation.

## Best Interests of Samuel and Elijah and Other Modifications

On the other hand, we find no merit to Joshua's contention that the district court abused its discretion with respect to any of the other modifications ordered. Under the modification order, any matter in the prior parenting plan, which was not specifically changed, remained in effect. Matters specifically changed by the modification order included parenting time ending at 7:30 p.m., rather than 9 p.m., requiring Joshua to transport Samuel and Elijah to and from his parenting time, the requirements as to the means and manner of communication

between Emily and Joshua, and clarification of its prior order with respect to legal custody.

The amount of parenting time with Samuel and Elijah set forth in the modification order is reasonable, providing a satisfactory basis for preserving and fostering Joshua's relationship with them. The modifications to transportation and communication are reasonable, especially considering the evidence of the poor communication between Emily and Joshua and between Joshua and Aurora and Olivia. While Joshua seems to take issue with having to utilize a coparenting application designed for that purpose, he does not explain why this is unreasonable. Joshua does not appear to challenge the other requirements that the communications be civil.

[22] It was also reasonable for the court to clarify its prior order with respect to legal custody. Under the Parenting Act, joint legal custody is the "'joint authority and responsibility for making major decisions regarding the child's welfare,'" while sole legal custody essentially establishes that one party will have the final say in such decisions.[49] The 2020 decree stated that Emily was a fit and proper person to have legal custody and control of the minor children with Joshua having reasonable right of parenting time pursuant to the attached parenting plan. While the 2020 parenting plan referred to joint legal custody and, if mutual agreement could not be found, seeking third-party mediation with respect to education decisions, it gave Emily the final decision with respect to nonemergency health care.

[23] The parenting plan incorporated with the decree becomes one integrated judgment, the meaning of which must be determined from all parts thereof, read in its entirety and, if possible, bringing all parts into harmony as far as this can be done by fair and reasonable interpretation.[50] Read in its

---

[49] See *Vyhlidal v. Vyhlidal*, 309 Neb. 376, 382, 960 N.W.2d 309, 314 (2021). See, also, § 43-2922 (11) to (13).

[50] See *Vyhlidal v. Vyhlidal*, 311 Neb. 495, 973 N.W.2d 171 (2022).

entirety, the 2020 decree arguably granted Emily sole legal custody. Even if it did not, the communication problems between Emily and Joshua evidenced at the modification hearing supported the court's modification of any joint legal custody arrangement.

## REMAND AND DISQUALIFICATION

We reverse the modification order as it pertains to Aurora and Olivia and remand the matter with directions for the district court to evaluate, under the principles set forth above, a reasonable visitation plan that is in Aurora's and Olivia's best interests. There is no merit to Joshua's contention that we should remand the matter to a new judge. First, Joshua did not move for disqualification below and therefore has not preserved this issue. Second, absent any direct personal connection to the proceeding, a judge's disqualification is not required as a matter of law.[51] Disqualification is not required simply because the court's rulings have been unfavorable.

## CONCLUSION

We affirm the modification order in all respects except as to its provisions governing Joshua's parenting time with Aurora and Olivia. We reverse that part of the order concerning visitation with Aurora and Olivia and remand the matter with directions to formulate a visitation plan in Aurora's and Olivia's best interests, which provides a satisfactory basis for preserving and fostering their relationship with Joshua, unless the strong presumption in favor of visitation is rebutted.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.

---

[51] *State v. Ezell*, 314 Neb. 825, 993 N.W.2d 449 (2023).

STACY, J., concurring.

Although I agree with the outcome reached by the majority opinion, I write separately to address parenting plan provisions

that purport to give one parent sole discretion to determine the other's parenting time.

To meet the requirements of Nebraska's Parenting Act,[1] every parenting plan must include certain elements, whether the plan was developed by the parties, a mediator, a court conciliation program, or created by the court.[2] As relevant here, every parenting plan shall include a determination of:

> Apportionment of parenting time, visitation, or other access for each child, including, but not limited to, specified religious and secular holidays, birthdays, Mother's Day, Father's Day, school and family vacations, and other special occasions, *specifying dates and times for the same, or a formula or method for determining such a schedule in sufficient detail that, if necessary, the schedule can be enforced in subsequent proceedings by the court,* and set out appropriate times and numbers for telephone access.[3]

Courts are required to review a parenting plan and determine if it meets the requirements of the Parenting Act.[4] If a parenting plan "lacks any of the elements required by the act,"[5] the court shall either

> modify and approve the parenting plan as modified, reject the parenting plan and order the parties to develop a new parenting plan, or reject the parenting plan and create a parenting plan that meets all the required elements and is in the best interests of the child.[6]

In light of these express statutory requirements, we have repeatedly emphasized that whether parents have agreed on a

---

[1] Neb. Rev. Stat. §§ 43-2920 to 43-2943 (Reissue 2016 & Cum. Supp. 2022).

[2] See § 43-2929(1)(b)(i) to (ix).

[3] § 43-2929(1)(b)(ii) (emphasis supplied).

[4] § 43-2935(1). See *Becher v. Becher*, 299 Neb. 206, 908 N.W.2d 12 (2018).

[5] § 43-2935(1).

[6] *Id.*

parenting plan or whether issues of custody and parenting time are disputed, "'the court is required to independently determine that any parenting plan being ordered is in the child's best interests *and must reject or modify parenting plans that are not in the child's best interests or which do not meet the requirements of the Parenting Act.*'"[7]

Because determining custody and parenting time is a judicial responsibility, it cannot be controlled by an agreement or stipulation of the parties.[8] And because the authority to determine custody and parenting time is a judicial function that cannot be delegated to others,[9] Nebraska's appellate courts have consistently reversed provisions in decrees and parenting plans that purport to give parents,[10] therapists,[11] psychologists,[12] or child

---

[7] *Hernandez v. Dorantes*, 314 Neb. 905, 929, 994 N.W.2d 46, 64 (2023) (Stacy, J., concurring) (emphasis supplied). See *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). See, also, §§ 43-2923(4), 43-2929(1) and 43-2935(1).

[8] See, *Hernandez, supra* note 7 (Stacy, J., concurring); *Becher, supra* note 4.

[9] *VanSkiver v. VanSkiver*, 303 Neb. 664, 930 N.W.2d 569 (2019) (finding court's authority to determine parenting time is judicial function that cannot be delegated to third party).

[10] *Barth v. Barth*, 22 Neb. App. 241, 851 N.W.2d 104 (2014) (finding order giving each parent discretion to withhold visitation from other amounted to unlawful delegation of trial court's duty to establish visitation); *Mark J. v. Darla B.*, 21 Neb. App. 770, 842 N.W.2d 832 (2014) (holding court abused its discretion by giving custodial parent discretion to determine terms and conditions of parenting time).

[11] *Hajenga v. Hajenga*, 257 Neb. 841, 601 N.W.2d 528 (1999) (finding provision of decree giving family therapist discretion to increase father's visitation was improper delegation of judicial authority).

[12] *Deacon v. Deacon*, 207 Neb. 193, 297 N.W.2d 757 (1980) (concluding order authorizing psychologist to determine scope of noncustodial parent's visitation was improper delegation of judicial duty), *disapproved on other grounds, Gibilisco v. Gibilisco*, 263 Neb. 27, 637 N.W.2d 898 (2002); *In re Interest of Teela H.*, 3 Neb. App. 604, 529 N.W.2d 134 (1995) (finding order giving psychologist authority to determine time, manner, and extent of parenting time was improper delegation of judicial authority).

support officers[13] the authority to make such determinations. Given the clarity of our case law in this area, it is surprising that lawyers continue to propose parenting plans that include improper delegation provisions and that courts continue to approve them.

Here, the mother's attorney developed a proposed parenting plan that expressly acknowledged, "Each parent is a fit and proper person to be involved in the parenting of the minor children." The plan included a specific parenting time schedule for the parties' two boys that gave the father regular weekly parenting time on certain days and addressed holiday and extended summer parenting time. But as to the parties' two girls, the proposed parenting plan stated:

> Any and all of the Father's parenting time, both regular and holidays, with the minor [girls] shall be at the Mother's sole discretion with at least seven (7) days prior notice from the Father. In the event the Mother agrees on a specific parenting time, the Father shall pick up [the girls] from the Mother at the beginning of said parenting time and shall return the minor children to the Mother at the end of said parenting time.

To the extent this proposed parenting plan gave the mother "sole discretion" to determine whether the father would have any parenting time at all with the girls, it was an improper and unlawful delegation of judicial authority that should have been rejected by the court. Moreover, because the proposed plan contained no specific dates, times, or methods by which to determine the father's parenting time schedule with his daughters in sufficient detail to allow him to enforce the schedule through contempt proceedings, it should have been rejected on that basis too.

---

[13] *Ensrud v. Ensrud*, 230 Neb. 720, 433 N.W.2d 192 (1988) (holding decree authorizing child support officer to control custody and parenting time was improper delegation of judicial authority), *disapproved on other grounds, State on behalf of Kaaden S., supra* note 7.

Instead, the court approved the proposed parenting plan without modification and incorporated it into the modification order. I therefore agree that we must reverse that portion of the modification order that approved and incorporated the parenting plan provisions regarding the parties' minor daughters and remand the matter with directions for the court to create a parenting plan that meets all the requirements of the Parenting Act and is in the best interests of the children.